RICHARD ERLICH, Plaintiff-Appellant, *v.* RALPH NYBERG *et al.*, Defendants-Appellees.

First District (5th Division)   No. 78-1449

Opinion filed November 9, 1979.

Feiwell, Galper & Lasky, Ltd., of Chicago (George S. Feiwell and Bernard L. Rivkin, of counsel), for appellant.

Wilson Frost and Paul P. Preston, both of Chicago, for appellee.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Plaintiff purchased 50 percent of the outstanding stock in the defendant 111 W. Division Operating Corporation (the corporation) which leased, operated and managed the Mark Twain Hotel in Chicago. The corporation refused to issue new certificates in plaintiff's name, asserting that he had acquired the stock in violation of a transfer restriction. Subsequently, defendants Harold Nyberg and Ralph Nyberg (president and vice-president respectively of the corporation and share-holders thereof) purchased the hotel, and the remaining shareholders were afforded the opportunity to acquire an ownership interest in the property in proportion to the amount of stock they held. However, when plaintiff sought to exercise this option to purchase a one-half interest, his request was denied on the ground that he was not a shareholder in the corporation.

Plaintiff then filed the instant action against the corporation, the Nybergs, and Cosmopolitan National Bank, as trustee,[1] seeking an order requiring the recordation of new certificates in his name, an order of specific performance requiring the Nybergs to sell plaintiff a 50-percent ownership interest in the building, an accounting by the Nybergs of income resulting from the purchase of the property with an award of 50 percent thereof to plaintiff, and for damages because of breach of contract. The trial court found for defendants on the ground that the transfer restriction was effective against plaintiff.

Plaintiff appeals from the judgment order, contending that the court erred in its findings that (a) plaintiff was not a bona fide purchaser of the shares in his own right; (b) plaintiff had actual knowledge of the transfer

---

[1] The holder of the title to the subject property when suit was filed.

restriction; (c) plaintiff did not take certain of the shares with the rights of a bona fide purchaser, even though he may not have been a bona fide purchaser in his own right; (d) the transfer restriction was not waived; (e) defendants were not estopped from asserting the transfer restriction; and (f) an individual other than plaintiff was in fact the actual purchaser of the stock.

The facts in this case are not easily ascertainable, inasmuch as the testimony is conflicting or unclear on several key points. Nonetheless, it appears that in November of 1963, the corporation entered into a lease agreement for the operation and management of the Mark Twain Hotel.[2] The lease term extended from January 1, 1964, to December 31, 1978. Paragraph 17 of the lease, which became central to the instant litigation, provided:

> "Lessee shall not allow or permit any transfer of this Lease or any interests under it or any lien upon Lessee's interest by operation of law, or assign or convey this Lease or any interest under it except upon the express consent in writing by the Lessor.
>
> During the term of this Lease no transfer other than by encumbrance or sale of the shares of Lessee shall be made except among members of the immediate families of Ralph Naiburg [*sic*] and Henry Mann, and no encumbrance or sale of any shares of Lessee shall be made, without Lessor's prior written consent (it being understood that Lessor's consent shall not be unreasonably withheld). Every stock certificate of Lessee shall bear the following legend upon the face thereof; or in the alternative, there shall be bold notice on the face of said certificate referring to the following legend on the reverse side thereof:
>
>> This certificate and the shares of stock represented thereby are held pursuant to the terms of Lease * * * and no transfer of this certificate or any of said shares may be made except in accordance with the provisions of Paragraph 17 of said Lease."

Although the corporation's attorney, Maurice Lewis, discussed each provision of the lease with the Nybergs and Henry Mann, who collectively owned 37½ percent of the outstanding stock at that time, no legend was ever printed on the certificates, and it appears that shares had been transferred without the lessor's written consent for several years following the execution of the lease. Specifically, the record reveals that when the lease was signed, 100 shares were outstanding—6¼ being owned by Ralph Nyberg, who was then and is now vice-president; 6¼ by Harold Nyberg, who became president in 1966; 12½ by Abraham Nyberg, who

---

[2] The agreement was with LaSalle National Bank, as trustee under a land trust, in which the owners of the Mark Twain Hotel were the beneficiaries.

was the father of Ralph and Harold; 25 by David Klafter; 25 by Arthur Ludwig; and 25 by Henry Mann. In 1966, Abraham Nyberg died—the result being that Ralph and Harold each came to own 12½ shares total, and when Klafter died his 25 shares passed to Lois Schubert, his heir. In 1974, Ludwig transferred his 25 shares to Samuel Rothbart, who in turn transferred 12½ of those shares to his son Michael. No familial relationship existed between the Rothbarts, Nybergs, Klafter and Mann.

In 1976, plaintiff, without the permission of the lessor, acquired the shares of Mann and the Rothbarts—for a total of 50 of the 100 outstanding shares. The details as to how and when plaintiff acquired such shares, which determine whether the transfer restriction was effective against plaintiff, are sharply disputed. In this regard, the record discloses that in early 1976 plaintiff inspected the property and made an offer to purchase it, contingent upon his being afforded the opportunity to read the lease; however, the offer was not accepted, and it appears that plaintiff did not review the lease at that time; that Ralph Nyberg testified to a meeting in early July 1976, at the Covenant Club with plaintiff and Julius Lopin (who is plaintiff's father-in-law) and, at this meeting, Lopin said he had purchased 50 shares from Mann and the Rothbarts, which he would sell to Ralph Nyberg for $25,000; that Nyberg told Lopin he "had no interest in buying his shares, buying the shares for $25,000; that there were restrictions in the lease agreement, and that Henry Mann, and Sam Rothbart, and Michael Rothbart had no business to sell those shares until they were offered to us first"; that Ralph testified that in a telephone conversation later that evening, he asked Mann why the shares were not first offered to him; that Mann replied that he did not think he (Nyberg) would be interested in the shares since the hotel was losing money and the lease would expire in a year and a half; and that Mann also said, "I sold the shares, and I don't care about any restrictions. If I did the wrong thing, I'll stand by it."

Ralph Nyberg also testified that two days after this conversation he met with Mann and his attorney, Sol Hoffman, at the Covenant Club, and that at this meeting Hoffman told Mann "that he was in error by selling to Mr. Lopin, or Mr. Erlich [plaintiff], and that it was a breach of the provision of that lease"; according to Ralph, Mann replied "that if that were the case, he would try to get the shares back." Hoffman's testimony essentially corroborated Nyberg's in this respect, although there is some indication that Hoffman was unsure as to whether the shares had actually been transferred at that point in time.

Three to four days later, as testified by Ralph Nyberg, at a meeting in Mann's office it was agreed that Mann would retrieve the shares and deliver them to Nyberg for $12,000. Ralph then telephoned Maurice Lewis, his attorney, and directed him to draft the necessary papers. However, Mann never delivered the shares.

According to plaintiff, however, his acquisition of the stock took place at a later time and under different circumstances; namely, that he met with Mann on July 26 in Mann's office and asked if he would be interested in selling his stock; that Mann was agreeable and immediately telephoned Samuel Rothbart, who also agreed to sell; that as he (plaintiff) left Mann's building, he ran into Lopin, told him of the purchase and asked him for a loan to pay for the stock; and that all stock certificates from Mann and the Rothbarts were endorsed over to plaintiff that same day—July 26. Mann and the Rothbarts, testifying as court's witnesses, stated that they were unaware of any transfer restrictions when they sold their stock to plaintiff.

Plaintiff further testified that on July 29 he telephoned Lewis (the Nybergs' attorney) and asked if there was a buy-sell agreement in effect regarding the stock; that Lewis said there was no such agreement; that he (plaintiff) asked for an appointment to come in and pick up new certificates issued in his name; and that Lewis replied that this would not take place until he "cleared the board with Ralph Nyberg, because Ralph is the boss."

Plaintiff testified that on August 1, Lopin gave him three checks to pay for the stock; that on August 2 he went to Mann's office and paid him with a check; and that later that day he gave two checks to Sam Rothbart at "the club"—one for Sam and the other for his son Michael.

Plaintiff says that on August 3, he went to Lewis' office with the endorsed stock certificates and asked that new certificates be issued in his name. Lewis refused, stating that he needed Ralph Nyberg's permission. Plaintiff then sent a letter to Ralph Nyberg, a copy of which was admitted into evidence, requesting the issuance of new certificates. Under section 60 examinations, the Nybergs admitted having received this letter on approximately August 4, and both testified that this was the first they knew of the sale of the stock to plaintiff.

Also, under section 60 examination, Lewis and the Nybergs stated that on August 6 the Nybergs discussed plaintiff's letter with Lewis and that Harold Nyberg reminded Lewis of the transfer restriction in the lease. Lewis testified that he had "no recollection of that particular provision of the lease until the Nybergs called it to my attention"; and that, pursuant to their instruction, he wrote a letter to plaintiff which was admitted into evidence, stating that new certificates would not be issued in plaintiff's name because the lease prohibited transfer without the consent of the lessor—which plaintiff had not obtained.

Plaintiff additionally testified that before receiving Lewis' letter on August 7 or 8, he had no conversation concerning transfer restrictions with either of the Nybergs, Mann, or the Rothbarts; and that his July 29

telephone conversation with Lewis concerned only whether there was a buy-sell agreement.

There is apparently no dispute as to subsequent events. On September 23, title to the hotel was transferred to Cosmopolitan National Bank, as land trustee, with the Nybergs as beneficiaries. On September 24, the Nybergs informed Mann, Schubert and the Rothbarts by letter that they were offering them the opportunity to purchase shares in the beneficial interest of the land trust, pro rata with their stock ownership in the corporation. On September 30, plaintiff wrote to Lewis and Ralph Nyberg, stating that as owner of 50 shares of the corporation's stock, he wished to exercise his option to purchase his share of the beneficial interest in the land trust. Ralph Nyberg took the position, however, that plaintiff was not a shareholder because the lessor's permission for transfer had not been obtained and, pursuant to Ralph's instructions, Lewis informed plaintiff by letter that he was not a proper stockholder and was not entitled to participate in the ownership of the building.

Plaintiff then filed the instant suit, arguing that the transfer restrictions were ineffective against him, taking the position at trial that he did not have actual or constructive notice of the restriction and was thus a bona fide purchaser under section 8—302 of the Uniform Commercial Code (Ill. Rev. Stat. 1977, ch. 26, par. 8—302) (hereinafter referred to as the Code), taking free of transfer restrictions; that because he did not have actual knowledge of the restriction, it was ineffective against him under section 8—204 of the Code; and that defendants by their conduct either waived the transfer restriction or were estopped from asserting it.

In the pertinent portions of its findings of fact and memorandum opinion, the trial court held that the meeting at the Covenant Club in early July of plaintiff, Lopin and Ralph Nyberg (to which Nyberg testified) did in fact occur; that at this meeting Lopin stated that he had purchased the stock but, in point of fact, had not; that Nyberg then informed them of the transfer restriction; that subsequently, on July 26, plaintiff procured assignments of the stock certificates from Mann and the Rothbarts; that on August 2, plaintiff paid Mann and the Rothbarts by check; that on August 3, plaintiff asked Lewis to issue new certificates in his name and reflect this change of ownership on the corporate books and that Lewis refused, citing plaintiff's failure to secure the lessor's approval of the transfer.

In the light of these findings, the trial court held, in essence, that plaintiff had actual knowledge of the restriction by virtue of his meeting in early July with Lopin and Ralph Nyberg; that plaintiff therefore was not a bona fide purchaser of the stock under section 8—302 of the Code and was not protected under section 8—204 as a party lacking actual knowledge of a transfer restriction; and that defendants did not waive the

transfer restriction nor were they estopped from asserting it. The court dismissed plaintiff's complaint for want of equity and also dismissed a third-party complaint of the Nybergs and the corporation. This appeal is from the dismissal of plaintiff's complaint, but no appeal has been taken from the dismissal of defendants' third-party complaint.

OPINION

Plaintiff first contends that the trial court's conclusion that the transfer restriction was effective against him is unsupported by the evidence. He argues that it is ineffective because he was a bona fide purchaser under section 8—302 of the Code and also because he did not have actual knowledge of the unnoted restriction under section 8—204.

Initially, we note that a "bona fide purchaser" is defined in section 8—302 as follows:

"A 'bona fide purchaser' is a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security in bearer form or of one in registered form issued to him or indorsed to him or in blank." (Ill. Rev. Stat. 1977, ch. 26, par. 8—302.)

The concept of "notice" is explained in section 1—201(25):

"A person has 'notice' of a fact when

(a) he has actual knowledge of it; or

(b) he has received a notice or notification of it; or

(c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists." (Ill. Rev. Stat. 1977, ch. 26, par. 1—201(25).)

The Code also provides that one who qualifies as a bona fide purchaser "acquires the security free of any adverse claim" (Ill. Rev. Stat. 1977, ch. 26, par. 8—301(2)), which includes a claim "that it has been * * * transferred in breach of * * * a valid restriction on transfer * * *." (Ill. Ann. Stat., ch. 26, par. 8—301, Uniform Commercial Code Comment, at 230 (Smith-Hurd 1974).)

However, in addition to the above general provisions relating to bona fide purchasers, the Code deals specifically with the effectiveness of transfer restrictions in section 8—204:

"Unless noted conspicuously on the security a restriction on transfer imposed by the issuer even though otherwise lawful is ineffective except against a person with actual knowledge of it." (Ill. Rev. Stat. 1977, ch. 26, par. 8—204.)

Thus, it is clear that, under the above Code provisions, if a transferee has actual knowledge of a transfer restriction which is not noted on the security, he does not qualify as a bona fide purchaser and is not protected under section 8—204. Accordingly, in determining whether the trial court

properly held that the restriction was effective as against plaintiff, we need only consider whether there was a sufficient evidentiary basis for finding that plaintiff had actual knowledge of the restriction.

■■ In support of his position that the record fails to establish such knowledge, plaintiff argues that he could not have received it from Mann or the Rothbarts (his transferors) since they testified that they had forgotten about this restriction until after the transfer had occurred; that he could not have learned of the restriction from the Nybergs since they testified that they were unaware that any transfer to him had taken place until they received his letter of August 3; that neither of the Nybergs advised him of a restriction prior to that date; and that he could not have learned of the restriction from Lewis, who testified that he had forgotten about the restriction until he was reminded of it on August 6 by the Nybergs. However, we also note, as defendants point out in their brief, that Ralph Nyberg also testified that he met with plaintiff and Lopin at the Covenant Club in early July (before the transfer of the stock on July 26) and that, concerning this meeting, he stated:

> "I told him that I had no interest in buying his shares, buying the shares for $25,000; *that there were restrictions in the lease agreement*, and that Henry Mann and Sam Rothbart, and Michael Rothbart had no business to sell those shares until they were offered to us first." (Emphasis added.)

With respect to this testimony of Ralph Nyberg, plaintiff argues first, that it was far outweighed by the other testimony to which he refers above and which tends to show his lack of actual knowledge of the restrictions; and second, even if this testimony is accepted as true, that Nyberg, in speaking of restrictions, was referring to a buy-sell agreement requiring that the shares first be offered to him and his brother (which did not in fact exist) and that he (plaintiff) was not given notice of the transfer restriction requiring lessor's permission during this conversation. Regarding plaintiff's second argument, we do not think that in the context of all of the testimony it is unreasonable for the trial court to have found, as it did, that the meeting did in fact occur in early July and that plaintiff and Lopin were then informed of the transfer restrictions.

While there is apparent conflict in the testimony concerning plaintiff's knowledge of the restrictions, it is a well-established rule that the trial judge is in a better position than a court of review to determine the weight and credibility of conflicting evidence (*Stilwell v. Continental Illinois National Bank & Trust Co.* (1964), 31 Ill. 2d 546, 202 N.E.2d 477; *Valasquez v. Yellow Cab Co.* (1975), 32 Ill. App. 3d 934, 337 N.E.2d 365; *Anderson v. City of Chicago* (1975), 29 Ill. App. 3d 971, 331 N.E.2d 243), and that a reviewing court should not supplant its judgment for that of the trier of fact who saw and heard the witnesses give conflicting testimony

(*Brayfield v. Johnson* (1965), 62 Ill. App. 2d 59, 210 N.E.2d 28), unless the finding of fact is clearly wrong (*Day v. Day* (1961), 33 Ill. App. 2d 247, 178 N.E.2d 203; see also 2 Ill. L. & Prac. *Appeal & Error* §788 (1953)). From our review of the record here, we cannot say that the trial court's determination that plaintiff had actual knowledge of the transfer restriction is against the manifest weight of the evidence.

■■ Plaintiff also maintains that, in any event, he acquired the 25 shares from the Rothbarts with the rights of a bona fide purchaser. He refers us to the "shelter provision" embodied in section 8—301 of the Code:

"(1) Upon delivery of a security the purchaser acquires the rights in the security which his transferor had or had actual authority to convey except that a purchaser who has himself been a party to any fraud or illegality affecting the security or who as a prior holder had notice of an adverse claim cannot improve his position by taking from a later bona fide purchaser." (Ill. Rev. Stat. 1977, ch. 26, par. 8—301(1).)

Plaintiff argues that the evidence shows that Samuel Rothbart was a bona fide purchaser of 25 shares and, when he transferred 12½ of those shares to his son Michael, the latter took them with the rights of a bona fide purchaser under section 8—301; that since Samuel was a bona fide purchaser, plaintiff took his 12½ shares with the rights of a bona fide purchaser; and that since Michael had the rights of a bona fide purchaser, plaintiff likewise took those 12½ shares with the same rights. In response, defendant points out that plaintiff did not assert this theory at trial and that he is therefore precluded from raising it on appeal. (*Hux v. Raben* (1967), 38 Ill. 2d 223, 230 N.E.2d 831; *Elliott v. Nordlof* (1967), 83 Ill. App. 2d 279, 227 N.E.2d 547; *McMillen v. Rydbom* (1965), 56 Ill. App. 2d 14, 205 N.E.2d 813.) In arguing to the contrary, plaintiff relies heavily on two cases. He first cites *Conyers v. Molloy* (1977), 50 Ill. App. 3d 17, 364 N.E.2d 986, where the purchaser of a house filed an action against the builder for breach of an implied warranty of habitability. A motion to dismiss the complaint was granted and plaintiff appealed, arguing *inter alia* that the warranty in the purchase contract was not waived. Defendant asserted that plaintiff could not raise this argument on appeal since it was not made in the trial court. Because no memoranda were submitted on the motion to dismiss and since the trial court did not specify its reasons for granting the dismissal, the reviewing court stated it could not determine whether the issue had been raised in the trial court. The reviewing court explained, however, that from a liberal construction of the pleadings, which is required in a motion to dismiss, the issue could have been considered raised or encompassed in the complaint and thus it held that plaintiff was not barred from raising the argument. *Conyers* does not persuade us, however, that plaintiff may raise this issue in the case at bar. First, we do not believe that the pleadings here, even construed liberally,

raise the theory now being asserted. Second, *Conyers* involved the dismissal of a complaint, and the court there properly viewed the pleadings in an expansive manner. In the instant case, however, we are not construing the pleadings to determine whether any set of facts could prove plaintiff's case but are presented with an entire trial record which fails to indicate that plaintiff raised this issue. Plaintiff also cites *People ex rel. Collins v. Young* (1967), 83 Ill. App. 2d 312, 227 N.E.2d 524. There, the appellant attempted to pursue an argument regarding "de facto boundary lines," and the appellee objected on the ground that this argument was not presented to the trial court. The objection was allowed, however, because while the exact phrase "de facto boundary lines" did not appear in the record, "the basic concept was in fact presented to the trial judge and his conclusion followed the same line of reasoning." (83 Ill. App. 2d 312, 319, 227 N.E.2d 524, 527.) *Collins* is not persuasive in the case at bar, however, since the record fails to indicate that the basic concept underlying plaintiff's present argument was presented to the trial court. Thus, in the light of the fact that there is no mention or inference of plaintiff's argument in the record and the fact that the trial judge made no ruling on this issue, we conclude that plaintiff is barred from asserting such argument at this point.

Moreover, we believe that plaintiff's contention must fail on the merits. His argument is based on the position that Samuel Rothbart was initially a bona fide purchaser in his own right; however, we are of the opinion that this was not sufficiently established in the record. One claiming the protection of bona fide purchaser status has the burden of proving lack of notice and good faith. (*Oscar Gruss & Son v. First State Bank* (7th Cir. 1978), 582 F.2d 424.) While plaintiff directs us to testimony that Samuel Rothbart lacked actual knowledge of the restriction, he points to no testimony negating constructive notice which, if possessed, would suffice to defeat bona fide purchaser status. (*Oscar Gruss & Son v. First State Bank*; Ill. Rev. Stat. 1977, ch. 26, pars. 8—302, 1—201(25).) Thus, we believe that Samuel Rothbart's status as a bona fide purchaser was not established, and that plaintiff may not claim protection under the "shelter provision" of section 8—301.

■■ Another issue presented by plaintiff is that there was a waiver of the two restrictions on transfer, in that defendants and lessor failed to have printed the legend on the certificates called for by the lease and by previously allowing the stock to be transferred to other parties without the lessor's written consent. We disagree. Waiver is an intentional relinquishment of a known right. (*Terracom Development Group, Inc. v. Coleman Cable & Wire Co.* (1977), 50 Ill. App. 3d 739, 365 N.E.2d 1028; *Allstate Insurance Co. v. National Tea Co.* (1975), 25 Ill. App. 3d 449, 323 N.E.2d 521.) In the case at bar, the transfer restriction is more appropriately characterized as an obligation of defendants, as

shareholders of lessee, to lessor—pursuant to the terms of the lease agreement. It was a right of the lessor that no transfer be made without its consent, and we do not see (nor has plaintiff explained) how the lessee could have "waived" its duty to comply with the terms of the lease by reason of its conduct toward third persons. While it may be true, as plaintiff states, that the Nybergs dominated the affairs of the corporation (lessee), there is nothing in the record to indicate that they could waive the rights of the lessor, which was the LaSalle National Bank, as trustee under a land trust, in which the owners of the hotel at that time were the beneficiaries. Moreover, mere acquiescence in the prior transfers does not evidence an intentional relinquishment by lessor of its right as to future transfers, as it appears that those prior transfers were by mutual agreement of the shareholders, which is more indicative of an intention not to relinquish their right to control those with whom they would be doing business in the future. In any event, we are of the opinion that plaintiff has not sustained his burden of showing waiver by clear and unequivocable evidence. *Kane v. American National Bank & Trust Co.* (1974), 21 Ill. App. 3d 1046, 316 N.E.2d 177.

██ Neither do we see merit in plaintiff's argument that defendants are estopped from asserting the existence of the transfer restriction. He refers us to a familiar definition of estoppel, which explains that it involves the concept of " 'reliance by one party, to the extent of a change of position to his detriment in good faith, upon the conduct of the other as a result of which that other party will not be permitted to raise a contention inconsistent with his misleading conduct.' " (*Terracom Development Group, Inc. v. Coleman Cable & Wire Co.* (1977), 50 Ill. App. 3d 739, 747, 365 N.E.2d 1028, 1034; *Allstate Insurance Co. v. National Tea Co.* (1975), 25 Ill. App. 3d 449, 461, 323 N.E.2d 521, 530.) Plaintiff appears to argue that defendants, by failing to apprise plaintiff of the transfer restriction, misled plaintiff into believing that no such restriction existed; that plaintiff relied upon this belief and purchased the shares on that basis; and that defendants should therefore be estopped from now asserting the existence of the restriction. We disagree, inasmuch as plaintiff has overlooked the following crucial aspect of the concept of estoppel:

> "To prevail on the theory of estoppel it [is] incumbent upon the [plaintiff] to prove that he had relied upon some acts or rep-resentation of the [defendants] *and had no knowledge or con-venient means of knowing the true facts.*" (Emphasis added.) (*Pantle v. Industrial Com.* (1975), 61 Ill. 2d 365, 371, 335 N.E.2d 491, 495.)

(See also *Levin v. Civil Service Com.* (1972), 52 Ill. 2d 516, 524, 288 N.E.2d 97, 102; *Hickey v. Illinois Central R.R. Co.* (1966), 35 Ill. 2d 427, 447, 220 N.E.2d 415, 425, *cert. denied* (1967), 386 U.S. 934, 17 L. Ed. 2d

806, 87 S. Ct. 957.) In the case at bar, the trial court found that plaintiff did in fact possess knowledge of the transfer restriction prior to acquiring the shares, and we held above that such finding was not against the manifest weight of the evidence. We therefore hold that plaintiff cannot prevail on an estoppel theory.

Included in plaintiff's brief is the suggestion that the trial court erred in a finding that Lopin (plaintiff's father-in-law) was the actual purchaser of the stock after the court had previously refused to hear evidence concerning the loan arrangement between plaintiff and Lopin because no issue had been raised as to who was the real party in interest. The portion of the trial court's opinion to which plaintiff objects reads in its entirety as follows:

> "Shortly after the 4th of July holiday in 1976, LOPIN told RALPH that he bought the 50 ROTHBART-MANN shares and would sell them to the NYBERGS for $25,000. RALPH told him of the restrictions on the sale of the stock but was told that LOPIN did not care about the restrictions, and that $25,000 was his price. In point of fact, *LOPIN had not yet purchased said shares.*"

It appears to us that the trial court based its holding primarily on the fact that plaintiff was present at the meeting with Lopin and Ralph Nyberg when the trial court found Nyberg stated that a transfer restriction existed. Moreover, it is not clear that the quoted statement was a finding that Lopin was the actual purchaser, as plaintiff argues. In any event, we find no error, as plaintiff had knowledge that the transfer was restricted.

■■ Finally, we note that at oral arguments, plaintiff posited that the transfer restriction in question was invalid as an unreasonable restraint on alienation. (See Ill. Ann. Stat., ch. 26, par. 8—204, Uniform Commercial Code Comment, at 214 (Smith-Hurd 1974).) This argument did not appear in plaintiff's original appellate brief but was asserted for the first time in his reply. Accordingly, such argument has been waived. (*Davis v. Retirement Board* (1975), 30 Ill. App. 3d 318, 332 N.E.2d 446; *In re Estate of Woodshank* (1975), 27 Ill. App. 3d 444, 325 N.E.2d 686; *United States Fidelity & Guaranty Co. v. Hollerich & Walgenbach Co.* (1974), 22 Ill. App. 3d 156, 319 N.E.2d 280.) Further, it does not appear from the record that this argument was advanced at trial, and plaintiff is likewise precluded from raising it now on that basis. (*Hux v. Raben; Elliott v. Nordlof.*) We therefore shall not consider the issue.

For the reasons stated above, the judgment of the trial court is affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.